

# DEMAND PROMISSORY NOTE AND SECURITY AGREEMENT

FOR VALUE RECEIVED, each of the undersigned dealers (referenced jointly and severally as the "<u>Dealer</u>" which term shall mean each of the undersigned individually and all of the undersigned collectively) on behalf of themselves individually and in their representative capacity jointly and severally promise to pay to the order of XL FUNDING, LLC ("<u>XLF</u>"), an Indiana limited liability company, on demand at XLF's principal office at 10333 N. Meridian St., Suite 200, Indianapolis, IN 46290 or such other place that XLF may designate in writing, all Obligations and the maximum principal amount of Two Hundred Fifty Thousand Dollars ($250,000) (the "<u>Credit Limit</u>"), or such greater or lesser sum as may be advanced from time to time, together with interest, costs, and fees as provided in this Demand Promissory Note and Security Agreement (the "<u>Agreement</u>"). Unless otherwise stated in an addendum to this Agreement, this Agreement shall become effective on the date of the Dealer's execution (the "<u>Effective Date</u>").

**1. DEFINITIONS**

**1.1 Defined Terms**. All capitalized terms used shall have the meaning ascribed to them in the definitions contained in Section 12 of this Agreement.

**1.2 Terms Defined in the Indiana Uniform Commercial Code**. Terms defined in the Indiana Uniform Commercial Code which are not otherwise defined in this Agreement are used as defined in the Indiana Uniform Commercial Code, as amended.

**2. LOAN**

**2.1 Loan**. Subject to the terms and conditions of this Agreement, XLF may make Loans to the Dealer in the maximum principal amount of the Credit Limit. The Loans are secured by this Agreement.

**2.2 Interest Rate**. Interest shall accrue on all the Dealer Obligations as follows:

(a) All outstanding Obligations under this Agreement shall accrue interest (based upon a 360-day year) and shall be compounded daily.

(b) Interest shall accrue on the earlier of the date that the Dealer buys any Lender-Financed Inventory or XLF Advances funds. The Dealer acknowledges and agrees to the accrual of interest before funding by XLF when titles are not immediately delivered to XLF after the Dealer purchases Lender-Financed Inventory.

(c) The Base Rate plus the Contract Rate (as stated on the applicable Term Sheet) shall be the rate of Interest, so long as the Dealer has not committed an Event of Default.

(d) If the Dealer breaches any representation, warranty, covenant or credit term which does not constitute an Event of Default under this Agreement, a Risk Fee may be assessed to the Dealer in XLF's sole discretion.

(e) If an Event of Default occurs as defined in Section 9 of this Agreement, the applicable rate of Interest shall be the Base Rate plus the Default Rate.

(f) The Base Rate, Risk Fee or Default Rate may be amended or modified by XLF in XLF's sole discretion by posting an amended or modified Base Rate, Risk Fee or Default Rate on a published rate, fee and term schedule posted on the Dealer Portal or in each XLF branch location. XLF may only increase the Base Rate or Default Rate by fifty (50) basis points in any thirty (30) day period.

(g) In the event that no Term Sheet has been executed or the Term Sheet does not include rate information, the Base Rate shall be six percent (6%), the Contract Rate shall be five percent (5%) and the Default Rate shall be twelve percent (12%).

**2.3 Credit Terms and Procedures**. In order to secure full and prompt payment and performance of all Obligations and in consideration of and a condition to the making of any Advance to the Dealer under this Agreement, the following terms and procedures shall apply:

(a) The decision to make an Advance to the Dealer is the exclusive right of XLF, and the Dealer understands and agrees that XLF may refuse to make an Advance at any time, with or without cause and without prior notice to the Dealer or any guarantors. The Dealer is not obligated to finance any Inventory through XLF. If Dealer's place of business is California, the amount of the first Advance under this Agreement must be at least Five Thousand Dollars ($5,000).

(b) All the Dealer requests made to XLF for Advances for the purpose of acquiring Purchase Money Inventory with XLF funds, or financing previously-acquired Inventory with XLF funds must include a copy of the bill of sale for any Unit which is the subject of the request, indicating the actual purchase price and vendor, a completed Odometer Disclosure Statement, and the Unit's certificate of title showing that it has been duly assigned to the Dealer. If XLF elects to make any such Advance, the Advance shall be deemed an additional Obligation under this Agreement from the date on which the Advance is made.

(c) XLF is not required to make, but may make, without notice to the Dealer and without regard to the Dealer's Credit Limit, Advances on the Dealer's behalf for Dealer's obligations to third parties at any time the Dealer is in default under the terms of the Agreement. If XLF elects to make an Advance, the Advance shall be deemed an additional Obligation under the Agreement from the date on which the Advance is made.

(d) The Dealer must be in complete compliance with this Agreement before an Advance request will be approved by XLF. XLF may also require additional information from the Dealer in a sworn affidavit including, but not limited to, a statement that the Dealer has not used any Advance for any other purpose than its originally requested and verified purpose.

(e) The Dealer shall pay all Obligations to XLF at the offices of XLF, on demand and without notice, with respect to Lender-Financed Inventory on the earliest of: (i) twenty-four (24) hours from the time the Dealer receives payment by or on behalf of the purchaser of an item of Lender-Financed Inventory; (ii) forty-eight (48) hours after the disposition by sale, lease, rent to own, lease to own or otherwise of an item of Lender-Financed Inventory; (iii) the Maturity Date or (iv) upon demand by XLF. XLF shall apply such payments to the Lender-Financed Inventory Obligation incurred from said item of Lender-Financed Inventory. Notwithstanding anything in this Agreement to the contrary, if, after the disposition by sale or otherwise and subsequent payment to XLF, a Shortage exists between payments received by XLF and the Lender-Financed Inventory Obligation with respect to an item of Lender-Financed Inventory, that Shortage shall be considered an Obligation owed by the Dealer to XLF and secured with Collateral other than Lender-Financed Inventory. The Dealer shall pay to XLF at the offices of XLF all other Obligations, on demand and without notice. The order and method of application of such payments of the Obligations shall be in the discretion of XLF. Payments received by XLF after 5:00 p.m. Eastern Standard Time may be applied the next Business Day.

(f) The order and method of application of payments that relate to a Floorplan Advance which exceed the outstanding Liabilities owed by the Dealer in connection with the Floorplan Advance and with respect to payments for all other Liabilities shall be at the sole discretion of XLF. XLF may apply all payments, including payments directly related to a Floorplan Advance, in any manner or order. Payments initiated or received by XLF after 5:00 p.m. Eastern Standard Time shall be applied the next Business Day. Payoffs requested after 5:00 p.m. Eastern Standard Time shall include interest through the next Business Day.

(g) Unless either: (i) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Floorplan Advance is in the final period pursuant to the applicable Term Sheet, a Curtailment of a Floorplan Advance will automatically be processed. Upon the processing of the Curtailment for a Floorplan Advance, the Dealer shall pay the accrued Interest, accrued Floorplan Fee, any other accrued Floorplan Advance related fees and a principal reduction of such Floorplan Advance pursuant to this Agreement, the applicable Term Sheet and any applicable event sale or promotional terms in effect for a Floorplan Advance. Unless the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default or the Dealer has notified XLF that it has disposed of the subject Unit of Lender-Financed Inventory by sale or otherwise, the Dealer shall be deemed to have requested, and XLF may, in its sole discretion, approve and process an Extension with respect to such Floorplan Advance. With respect to any Extension, the period, accrued Interest, accrued Floorplan Fee, any other Floorplan related fees, and the principal reduction required to be paid by the Dealer for such Extension shall be equal to those of the prior period and, upon the processing of the Extension, the Dealer shall pay accrued Interest, accrued Floorplan Fee, any other accrued Floorplan Advance related fees, and principal reduction of such Floorplan Advance pursuant to this Agreement, the applicable Term Sheet, and any applicable event sale or promotional terms in effect for the Floorplan Advance. For each Extension, the Dealer shall be charged any applicable XLF Program Fee (including any Extension Fee) set forth in the XLF Summary of Rates, Fees and Terms for the applicable Finance Program.

(h) So long as the Dealer is not in default of this Agreement, the Dealer may sell Lender-Financed Inventory to *bona fide* purchasers in the ordinary course of the Dealer's business, but nothing in this Agreement shall be deemed to waive or release any interest XLF may have under any other agreement in any Proceeds or replacements of the Lender-Financed Inventory. Upon the sale of any item of Lender-Financed Inventory, the Dealer shall hold the amount received from the disposition in trust for the benefit of XLF and the Dealer shall pay to XLF, in accordance with this Agreement, an amount equal to the unpaid balance of the Obligations relating to the sold item of Lender-Financed Inventory.

(i) The Dealer shall allow XLF's officers, employees, agents, attorneys, designees and representatives access to the Dealer's books and records at the Dealer's Location to conduct audits of the Dealer's Lender-Financed Inventory. The Dealer shall be responsible for and agrees to pay all of XLF's expenses in conducting audits.

(j) Upon request by the Dealer to obtain, for a legitimate business purpose, the Title to a specific item of Lender-Financed Inventory held by XLF, XLF may consider the request and, in XLF's sole discretion, grant such request. In the event XLF grants a request, XLF may require the Dealer to deliver to XLF a check or draft which is signed and dated on the date on which the Dealer takes physical custody of the Title in an amount equal to the Obligation relating to the specific item of Lender-Financed Inventory. The subject Title must be returned to XLF within the time period established by XLF or any outstanding Obligation relating to any such Advance for such specific items of Lender-Financed Inventory shall become immediately due and payable, and XLF may deposit or present such check or draft for payment in partial or whole satisfaction.

(k) To protect XLF's interest, the Dealer authorizes XLF to obtain credit information from a credit bureau, and any financial institutions or trade creditor that the Dealer has provided, as well as any other credit investigation that XLF in XLF's sole discretion deems necessary. The Dealer also authorizes XLF to contact any third parties to disclose information, including information contained in the XLF application, for the purpose of, among other things, obtaining inter-creditor agreements and perfection of XLF's security interest. All payments made by the Dealer to XLF *via* check or ACH, at the time of issuance, must be written against or drawn upon an account that contains immediately available funds sufficient to cover the dollar amount of the check or ACH.

(l) The Dealer's account is subject to "NSF" fees in the amount stated in the Term Sheet, XLF Summary of Rates, Fees and Terms or maximum amount permitted by law for each check or ACH issued by the Dealer which is

subsequently returned for insufficient funds in addition to any charge or fee imposed by the Dealer's or XLF's depository institution.

(m) XLF may process checks electronically by transmitting the amount of the check, routing number, account number and check serial number to the Dealer's financial institution. By submitting a check for payment, the Dealer authorizes XLF to initiate an electronic debit from its bank account. When XLF processes the Dealer's check electronically, the Dealer's payment may be debited from its bank account as soon as the same day XLF receives the Dealer's check and it will not receive that cancelled check with the Dealer's bank account statement.

(n) The Dealer's account is subject to late fee charges in the amount stated in the Term Sheet, XLF Summary of Rates, Fees and Terms or the maximum amount permitted by law for any item of Lender-Financed Inventory for which the Dealer fails to remit payment under this Agreement when due. The Dealer acknowledges and agrees that the late fee charged by XLF is a reasonable estimate of XLF's probable losses due to the delay, inconvenience, and administrative expenses associated with a late payment.

(o) The Dealer's account is subject to Administrative Charges. The Dealer acknowledges and agrees that any Administrative Charge levied by XLF is permitted under this Agreement and the other Loan Documents, and the Dealer consents to the assessment of all Administrative Charges to the Dealer's account. Any Administrative Charge not satisfied on the Maturity Date shall be added to the Principal Balance effective on the date it was advanced.

(p) The Dealer's account is subject to XLF Program Fees. XLF maintains and publishes the "XLF Summary of Rates, Fees and Terms" for each Finance Program applicable to the Dealer's Credit Line which may be distributed to dealers *via* email or made available on the Dealer Portal in the future. When the Dealer Portal commences the display of XLF Summary of Rates, Fees and Terms, the Dealer agrees to accept such online publication as notice and no email notice shall be necessary. The Dealer may also request a copy of the XLF Summary of Rates, Fees and Terms from XLF in writing at any time. All universal or generally applicable rates and fees and any amendments to the Terms and Conditions shall be published, incorporated by reference and made a part of this Agreement and any other applicable Loan Documents. The rates and fees applied to the Dealer's Liabilities under this Agreement, any amended Terms and Conditions, or any applicable event sale or promotional terms in effect with respect to an eligible Floorplan Advance shall be: (i) the applicable rates and fees set forth on the applicable Term Sheet; (ii) the rates, fees and amendments to the Terms and Conditions most recently published on the applicable XLF Summary of Rates, Fees and Terms; and (iii) the rates, fees, terms, and conditions as set forth in the applicable marketing materials outlining event sale or promotional terms. XLF may amend the rates, fees and Terms and Conditions from time to time, at XLF's sole discretion, and without additional notice to the Dealer other than either publication of such amendments on the Dealer Portal or email to the Dealer in the event the information is not available on the Dealer Portal.

(q) XLF shall be entitled to maintain and publish changes to its Term Sheet by either notifying the Dealer *via* email or posting the changes on the Dealer Portal. Any rates, fees and amendments to the Term Sheet published by XLF shall be incorporated in this Agreement by reference and made a part of this Agreement. XLF may amend the rates and fees from time to time at XLF's sole discretion and without additional notice to the Dealer other than the publication of amendments on the Dealer Portal or *via* email.

(r) The Dealer waives demand, presentment for payment, notice of dishonor, protest and notice of protest, and expressly agrees that the Agreement and all payments coming due under it may be extended or modified without affecting the Dealer's Obligations under this Agreement. The Dealer understands that this Agreement matures upon issuance and that XLF may, at any time and without notice to the Dealer, with or without cause, demand that the Obligations due under this Agreement be immediately paid in full. The demand nature of this Agreement does not limit XLF's election of remedies upon a default by the Dealer. At XLF's option, XLF may reference a term of default for the purpose of permitting XLF to receive interest at the Default Rate. It is agreed that XLF may demand partial payments under this Agreement, and said partial demand shall not change XLF's rights under this Agreement.

(s) The Dealer shall use all Advances solely for business purposes and not for personal, family or household purposes including, without limitation, the Dealer may not use Advances to purchase a vehicle to be used for the Dealer's personal, family, or household purposes.

(t) The Dealer will provide XLF the name of each individual authorized to buy Inventory and make Advance requests on the Dealer's behalf. Notwithstanding anything to the contrary in any Loan Document, the Dealer shall be responsible and liable for all Advance requests and other Liabilities incurred by any appointed individual or any other actual or *apparent* representative or agent of the Dealer regardless of whether such Person is specifically appointed by the Dealer.

3. **SECURITY INTEREST IN COLLATERAL**

**3.1 Grant of Security Interest**. As security for the payment and performance of the Obligations, XLF shall have, and the Dealer grants to XLF, a continuing security interest in all of the Dealer's assets and properties, wherever located, including, without limitation, the following Collateral:

(a) All Accounts, Deposit Accounts, General Intangibles, Documents, Instruments, Investment Property, Chattel Paper and any other similar rights of the Dealer however created or evidenced, whether now existing or hereafter owned, acquired, created, used, or arising, specifically including, without limitation, claims, leases, agreements, license agreements, licensing fees, royalties, policies, credit insurance, guaranties, letters of credit, advices of credit, binders or certificates of insurance, deposits, documents of title, securities, security interests, licenses, goodwill, tax refunds, customer lists, franchises, franchise rights, drawings, designs, marketing rights, computer programs, artwork, databases

and other business property rights, all applications to acquire rights, for which application may at any time be made by the Dealer, together with any and all books and records pertaining to those rights and any right, title or interest in any Inventory which gave rise to an Account, and all Intellectual Property throughout the world;

(b) All Inventory, whether now existing or acquired and wherever located, specifically including, without limitation, Purchase Money Inventory now owned or acquired, and all additions, accessions, accessories, replacements, and Proceeds, together with any and all books and records;

(c) All Equipment, vehicles, vehicle parts, Fixtures, Goods and all other tangible personal property of the Dealer of every kind or nature, whether now owned or acquired, wherever located, specifically including, without limitation, all machinery, trucks, boats, on and off the road vehicles, forklifts, tools, dies, jigs, presses, appliances, implements, improvements, accessories, attachments, parts, components, partitions, systems, carpeting, draperies and apparatus;

(d) All products and proceeds of each of the foregoing, specifically including, without limitation:

(i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Dealer from time to time,

(ii) any and all payments of any form made or due and payable to the Dealer in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the foregoing by any Governmental Authority or any Person acting under color of Governmental Authority,

(iii) to the extent of the value of Collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the Collateral,

(iv) any Stock Rights, and

(v) any and all other amounts paid or payable under or in connection with any of the foregoing, whether or not in lieu the foregoing;

(e) All renewals, extensions, replacements, modifications, additions, improvements, accretions, accessions, betterments, substitutions, replacements, annexations, tools, accessories, parts and the like now in, attached to or which may be placed in or added to any Collateral, whether or not of like kind; and

(f) All rights, remedies, claims and demands under or in connection with each of the foregoing.

**4. REPRESENTATIONS, WARRANTIES, AND COVENANTS**

To induce XLF to enter into the Agreement and to make each advance and other financial accommodation, the Dealer (meaning each of the undersigned individually and all of the undersigned collectively, jointly and severally) represents and warrants to XLF that, except as may otherwise be provided in the Agreement:

**4.1 Name of Dealer**. The exact legal name of the Dealer as it is organized and its state of organization are each correctly stated in the signature page of this Agreement. The Dealer shall immediately notify XLF in writing of any change to the Dealer's legal name, address, business type, ownership, management or control, and shall execute any document necessary at XLF's request to bring the Dealer into compliance with this Agreement.

**4.2 Principals and Dealership Location**. The Dealer's principals and dealership location are set forth correctly in the Floor Plan Application. The Dealer maintains all of its records with respect to its Accounts at the Dealership Location. The Dealer has not at any time within the past four (4) months maintained its Dealership Location or its records with respect to Accounts at any other location.

**4.3 Title to Collateral**. All Collateral is lawfully owned by the Dealer, free and clear of any prior security interest, pledge, sale, assignment, transfer or other encumbrance other than Permitted Encumbrances; the Dealer has the unencumbered right to pledge, sell, assign or transfer the Collateral subject to the Permitted Encumbrances and to subject the Collateral to the security interest in favor of XLF; except for Permitted Encumbrances, no financing statement covering all or any portion of the Collateral is on file in any public office other than in favor of XLF; and the security interest created by this Agreement constitutes a legal and valid, first priority security interest in the Collateral.

**4.4 Business Records**. The Dealer shall keep at all times complete and accurate records of the Dealer's business and financial condition as XLF may reasonably request, including, but not limited to, records and statements related to all Advances the Dealer requests and all other transactions with XLF including bank statements, cancelled checks, sales invoices, proof of payment, and sales files for at least five (5) years after each Advance or transaction is made. The Dealer shall promptly provide to XLF copies of such records and any financial information regarding the Dealer's business or the Dealer's financial condition when requested by XLF. The Dealer shall provide the documentation no later than two (2) Business Days after it is requested by XLF. The Dealer authorizes XLF to share the information and any other information relating to the Dealer's transaction with XLF to any and all persons or parties as XLF deems necessary.

**4.5 Negative Covenants**. Without the prior written consent of XLF:

(a) The Dealer shall not pay or declare any dividends or distributions, redeeming any capital stock, repaying subordinate debt or other loans to any principal or guarantor of the Dealer, during any time an Obligation exists from the Dealer to XLF.

(b) The Dealer shall not sell, transfer, lease or otherwise dispose of the Collateral, or discounting, with or without recourse, any of its Accounts, except for sales from Inventory in the ordinary course of business.

(c) The Dealer shall not create or suffer to exist any Lien upon any of the Collateral, whether now owned or hereafter acquired.

(d) The Dealer shall not enter into any consolidation or merger with, or acquisition of, any Person or sell any substantial portion of its assets.

(e) The Dealer shall not undertake or permit any of its equity holders to undertake any transaction or series of transactions that would result in the equity holders of the Dealer, as of the Effective Date, owning and controlling less than seventy-five percent (75%) of all classes of the outstanding equity of the Dealer on a fully-diluted basis.

(f) The Dealer shall not purchase, redeem, retire or otherwise acquire any of its outstanding equity interests.

(g) The Dealer shall not assume, guarantee or otherwise become liable as a guarantor or surety for the obligations of any Person, except (i) the endorsements by Borrower of negotiable instruments for deposit or collection in the ordinary course of business, and (ii) those in favor of XLF.

(h) The Dealer shall not engage in any transaction with any Person other than in the ordinary course of business.

(i) The Dealer shall not change its fiscal year or any of its significant accounting policies.

(j) The Dealer shall not make any material change in the nature of its business as of the date of this Agreement.

(k) The Dealer shall not permit any event to occur or condition to exist which has a Material Adverse Effect and shall not directly or indirectly enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder or holders of any of the equity interests of Borrower, or with any Affiliate of Borrower which is not its Subsidiary, on terms that are less favorable to Borrower or any of its Subsidiaries, as applicable, than those that might be obtained in an arm's length transaction at the time from Persons who are not such a holder or Affiliate.

(l) The Dealer shall not amend, modify or otherwise change any of the terms or provisions in any of its articles of organization or operating agreement in effect on the date of this Agreement without the prior written consent of XLF.

(m) The Dealer shall not make any loans or other advances of money or any loans or advances of Inventory or other property to any Person, including any officer, director, stockholder, employee, or Affiliate of the Dealer, other than advances against commissions, and other similar advances to employees in the ordinary course of business, and loans not exceeding an aggregate of two percent (2%) of the Credit Line.

**4.6 Permits and Licenses**. The Dealer warrants that it has obtained all necessary permits and licenses pursuant to local, state, and federal law required to operate its business, and has complied with all filing requirements to operate as the entity or business type on record with the appropriate governmental offices.

**4.7 No Pending Actions**. The Dealer warrants that there are no legal, arbitration, administrative or other proceedings pending or threatened against the Dealer which could reasonably affect the Collateral or which materially and adversely affect the properties, business, prospects, or condition, financial or otherwise, of the Dealer or the Dealer's ability to honor its Obligations.

**4.8 Guarantees**. The Dealer shall cause each owner of the Dealer to execute a guaranty in a form provided by XLF in favor of XLF with respect to the Obligations. If the Dealer is owned in whole or in part by a legally recognized business entity or trust, then the Dealer shall cause the entity or trust to execute a guaranty in the name of the entity or trust in addition to any other required guaranties. All guarantees shall be incorporated by reference and made a part of this Agreement.

**4.9 Representations Regarding Accounts**. Except for Permitted Encumbrances, each Account:

(a) is a valid Account representing an undisputed, *bona fide* right to payment from the Account Debtor named for goods sold or leased, intellectual property licensed, or for services rendered, whether or not the right to payment has been earned by performance;

(b) is free and clear of any agreement in which the Account Debtor may claim a deduction or discount; and

(c) is free and clear of all set-offs or counterclaims.

**4.10 Representations Regarding Contracts and Leases**. All leases of real or personal property and all contracts to which the Dealer is a party are in full force and effect. To the best of the Dealer's knowledge, no Person is challenging or disputing the validity or enforceability of any such leases or contracts, and the Dealer is not in material default under any such leases or contracts.

**4.11 Representations Regarding Equipment and Inventory**. The Dealer has not purchased any Inventory in a transaction subject to the bulk transfer laws of any state or otherwise outside the ordinary course of the seller's business.

**4.12 Representations Regarding Consigned Goods**. The Dealer does not engage in the sale of consigned goods. The Dealer is not a party to any consignment contracts. The Dealer is not generally known by its creditors to be in the business of selling consigned goods.

**4.13 Representations Regarding Sufficient Cash**. The Dealer now has, and will continue to have at the time of any Advance and through the date of any repayment of the Obligations: (i) sufficient cash and equity capital to conduct its business and pay its debts as they mature; (ii) sufficient capital and other financial resources necessary to engage in the business and perform its obligations under any agreement to which it is a party and any transaction in which it may engage

hereafter; and (iii) ownership of property having an aggregate fair market value that is greater than the sum of the Dealer's debts.

5. **AGREEMENTS CONCERNING ACCOUNTS**

   **5.1 Location**. The Dealer will give XLF written notice of each office of the Dealer at which records of the Dealer relative to the Accounts are kept. Except where notice is given, all records of the Dealer relative to the Accounts are and will be kept at the Dealership Location.

   **5.2 Schedule of Accounts**. Upon request by XLF, the Dealer will, from time to time, deliver to XLF a schedule identifying each Account ("<u>Schedule of Accounts</u>"), together with such schedules and certificates and reports relative to all or any of the Collateral and the items or amounts received by the Dealer in full or partial payment as Proceeds of the Collateral. Each Schedule of Accounts or other schedule, certificate or report shall be executed by its duly authorized officer and shall be in the form specified by XLF. Any Schedule of Accounts identifying any Account shall be accompanied, if XLF requests, by a true and correct copy of the invoice evidencing such Account.

   **5.3 Perfection of Security Interest**. The Dealer shall take all action that may be necessary or desirable, or that XLF may otherwise reasonably request, so as at all times to maintain the validity, perfection, enforceability and priority of XLF's security interest in the Collateral or to enable XLF to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to:

   (a) immediately discharging all Liens other than Permitted Encumbrances;

   (b) using commercially reasonable efforts to obtain applicable Waivers, as XLF may reasonably request;

   (c) delivering to XLF, endorsed or accompanied by Instruments of assignment as XLF may specify, and stamping or marking, in a manner acceptable to XLF, any and all Chattel Paper, Instruments, Letters of Credit and advices and documents evidencing or forming a part of the Collateral;

   (d) entering into lockbox, warehousing and other custodial arrangements reasonably satisfactory to XLF;

   (e) executing and delivering control agreements, instruments of pledge, notices, assignments and lockbox arrangements, in each case in form and substance reasonably satisfactory to XLF, relating to the creation, validity, perfection, maintenance or continuation of XLF's security interest in Collateral under the Uniform Commercial Code or other applicable law; and

   (f) by the signature of its authorized representative below, the Dealer authorizes XLF to file against the Dealer, one or more financing, continuation, or amendment statements to perfect Liens in the Collateral securing the Obligations in form and substance satisfactory to XLF (which may describe the Collateral with such words as "all assets" or other words of similar effect).

   All charges, expenses and fees XLF may incur in maintaining and perfecting its security interests and any taxes relating to these activities shall be charged to the Dealer, added to the Obligations or, at XLF's option, shall be paid to XLF immediately upon demand. The Dealer shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect XLF's security interest and shall cause its Financial Statements to reflect XLF's security interest.

   **5.4 Assignment of Security Interests**. If, at any time the Dealer shall take and perfect a security interest in any property of an Account Debtor or any other Person to secure payment or performance of an Account, the Dealer shall promptly assign that security interest to XLF.

6. **AGREEMENTS CONCERNING CERTAIN COLLATERAL**

   **6.1 After-Acquired Intellectual Property**. If the Dealer obtains rights to any new Intellectual Property, the provisions of this Agreement shall automatically apply. With respect to any new applications for Intellectual Property, the issuance of any new registration for Intellectual Property, and any renewals or extensions, the Dealer shall give XLF prompt written notice in writing.

   **6.2 Supplemental Documentation**. Concurrently with the execution of this Agreement, and upon request of XLF, the Dealer shall execute and deliver to XLF supplemental agreements relating to any registered patents, trademarks, tradenames, copyrights and applications, in a form satisfactory to XLF and suitable for recording in the records of the registering Governmental Authority.

   **6.3 Contracts and Leases**. The Dealer shall perform, when due, each of its obligations under all contracts, leases and other agreements (including, without limitation, all license agreements) to which the Dealer is a party, and, immediately upon learning of any material default by any party under any such contract, lease or other agreement, the Dealer shall give written notice to XLF, together with a description as to the nature and status. After the occurrence of any Default or Unmatured Default, the Dealer shall not amend, modify, supplement or otherwise agree to any change in any contract, lease or other agreement or waive any provision, without the prior written consent of XLF.

   **6.4 Letter-of-Credit Rights**. The Dealer will, upon XLF's request, cause each issuer of a letter-of-credit to consent to the assignment of Proceeds of the letter-of-credit in order to give XLF Control of the letter-of-credit rights.

   **6.5 Uncertificated Securities**. The Dealer will permit XLF to cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated securities which are Collateral to mark their books and records with the numbers and face amounts of all uncertificated securities and rollovers and replacements to reflect the Lien of XLF granted pursuant to this Agreement. The Dealer will take any actions necessary to cause the issuers of uncertificated securities which are Collateral and which are Securities to cause XLF to have and retain Control over pledged securities.

## 7. AGREEMENTS CONCERNING INVENTORY

**7.1 Locations**. The Dealer shall keep Lender-Financed Inventory only at its Dealership Location and shall not remove Lender-Financed Inventory for a period exceeding twenty-four (24) hours. Each Unit of Lender-Financed Inventory must be physically verified to be at its Dealership Location or such other place as XLF may authorize at the time of any audit conducted by XLF. In the event that any Unit of Lender-Financed Inventory is not verified, XLF may, in its sole discretion, provide the Dealer an opportunity to produce such Unit of Lender-Financed Inventory at the Dealership Location or other place as XLF may authorize.

**7.2 Sales of Inventory**. The Dealer shall dispose of Lender-Financed Inventory only in the ordinary course of the Dealer's business and not dispose of such Lender-Financed Inventory, except as provided in this Agreement.

**7.3 Condition of Inventory; Insurance**. The Dealer shall keep all Inventory in good order and condition and shall maintain full, accurate and complete books and records with respect to Inventory at all times. The Dealer shall keep all Lender-Financed Inventory insured against all physical risks in amounts and under policies issued by an insurance company as are deemed necessary and satisfactory to XLF. Any insurance company issuing the required coverage to the Dealer pursuant to this Section 7.3 shall have been assigned to an A.M. Best Financial Size Category (FSC) of "VII" or higher, and shall have a minimum A.M. Best Financial Strength (FSR) rating of "A-". XLF shall be named a "loss payee" on all policies to the extent XLF's interest may apply. In the event the Dealer fails to procure, maintain or provide proof of insurance coverage, XLF may, in its sole discretion, purchase insurance necessary to protect its interest and collect the costs from the Dealer.

**7.4 Warehousemen and Landlords**. The Dealer shall not store any material portion of its Inventory with any bailee, warehouseman, or similar party without XLF's prior written consent. If Inventory is so stored, the Dealer will, concurrently with storing such Inventory, cause the bailee, warehouseman or similar party to issue and deliver to XLF, in a form acceptable to XLF, warehouse receipts in XLF's name evidencing the storage of the Inventory. The Dealer shall provide XLF with copies of all agreements between the Dealer and any bailee, warehouseman or similar party and shall deliver to XLF a landlord's or warehouseman's lien waiver in a form acceptable to XLF, prior to entering into any material lease for warehouse storage or business facilities.

**7.5 Inspection**. The Dealer shall allow XLF and its representatives to inspect the Lender-Financed Inventory during normal business hours and at other reasonable times and to inspect and make copies of the Dealer's books and records. The Dealer shall pay XLF upon demand for the costs and expenses incurred by XLF or its representatives for such inspections of the Dealer's books and records and audits of the Dealer's Lender-Financed Inventory.

**7.6 Trust Account**. The Dealer shall hold as a fiduciary all amounts received from the sale of Lender-Financed Inventory in the form as received in trust for the sole benefit of XLF and shall remit funds satisfying all amounts due and owing XLF for the sold item of Lender-Financed Inventory within twenty-four (24) hours of receipt of said funds.

**7.7 Compliance with Law**. The Dealer shall substantially comply in all material respects with all federal, state and local laws, regulations, rulings and orders applicable to the Dealer for its assets or business in all respects. Without limiting the generality of the foregoing, the Dealer shall comply with all requirements of the federal Fair Labor Standards Act, as amended, in the conduct of its business. The Dealer shall notify XLF immediately of any violation by the Dealer of the Fair Labor Standards Act.

**7.8 Consignment**. The Dealer shall not engage in the sale of consigned goods for consumer consignors.

## 8. GENERAL PROVISIONS CONCERNING COLLATERAL

**8.1 Title to After-Acquired Collateral**. All Collateral acquired after the date of the Agreement will be acquired by the Dealer free and clear of any lien, security interest or encumbrance, except Permitted Encumbrances.

**8.2 Further Assurances**. The Dealer agrees to do such reasonable acts and things and deliver or cause to be delivered such other Documents as XLF may deem necessary to establish and maintain a valid security interest in the Collateral (free of all other liens and claims except Permitted Encumbrances) to secure the payment and performance of the Obligations and to defend title to the Collateral against any Person claiming any interest therein adverse to XLF. The Dealer authorizes XLF, at the expense of the Dealer, to execute and file a financing statement or statements on its behalf in those public offices deemed advisable or necessary by XLF to protect the security interests of XLF. If permitted by law, the Dealer agrees that a reproduction of this Agreement or of a financing statement may be filed with the financing statement.

**8.3 Insurance**.

(a) The Dealer shall have and maintain at all times, with respect to Inventory and Equipment, insurance written by companies acceptable to XLF covering risks customarily insured against by companies engaged in business similar to that of the Dealer in reasonable amounts, containing terms customarily maintained by companies engaged in business similar to that of the Dealer. Such insurance shall be payable to the Dealer and XLF as their interests may appear.

(b) In addition to the insurance requirements set forth in Section 8.3(a), the Dealer will carry any other insurance and amounts for periods as may be reasonably required by XLF, and will deliver to XLF, not less than five (5) days prior to the expiration of any policy of insurance, renewals or new policies in like amounts covering the same risks.

(c) All insurance policies shall carry standard, non-contributory lender's loss payable clauses and breach of warranty endorsements in favor of XLF. The insurance certificates evidencing the Dealer's compliance shall be deposited with XLF, and in the event the Dealer fails to file and maintain insurance, XLF may, at its option, purchase insurance and the cost of that insurance shall become an Obligation secured by this Agreement and all sums expended shall bear interest at the Default rate of interest set forth in the Agreement until paid. If requested by XLF, the Dealer shall deliver certified copies of the policies to XLF. The Dealer shall pay all insurance premiums promptly when due and shall provide substitute policies of insurance should XLF at any time reject, for reasonable cause, any such policies of

insurance furnished by the Dealer. The Dealer assigns to XLF the Proceeds of all insurance, including, without limitation, any premium refunds, to the extent of the Obligations, shall direct the insurer to make payment of any losses or refunds directly to XLF and appoints XLF its attorney-in-fact to endorse any draft, check or other form of payment made by its insurers.

**8.4 Collection of Collateral**. The Dealer will, at its own expense, collect all amounts due with respect to any Collateral including taking action with respect to collection as XLF may reasonably request or, in the absence of such request, as the Dealer may deem advisable.

**8.5 XLF May Defend Title**. In the event the Dealer fails to pay any taxes, assessments, premiums, or fees, or fails to discharge any liens or claims against the Collateral required to be paid or discharged by the Dealer, or fails to purchase, maintain and file with XLF any insurance required by this Agreement, or if any insurance is inappropriate to the situation, in XLF's reasonable discretion, XLF may, without demand or notice, pay any taxes, assessments, premiums or fees, or pay, acquire, satisfy or discharge any liens or claims asserted against the Collateral (without any obligation to determine the validity thereof), or purchase any insurance. All sums expended by XLF shall become an Obligation secured by this Agreement and shall bear interest at the highest default rate of interest set forth in the Agreement until paid.

**8.6 Negotiable Collateral**. If any Collateral, including Proceeds, consists of a letter of credit, advice of credit, certificate of deposit, negotiable instrument, chattel paper or similar property, the Dealer shall, immediately upon receipt, endorse and assign the Collateral to XLF, deliver actual physical possession to XLF and, prior to delivery, shall hold property in trust for XLF. The Dealer will give XLF written notice each time it acquires additional negotiable Collateral.

**8.7 Contracts**. The Dealer shall remain liable to perform its obligations under any contracts included in the Collateral as though this Agreement had not been entered and XLF shall not incur any obligation under any contracts by reason of this Agreement.

**8.8 Accounting System**. The Dealer shall maintain an accurate, standard and modern system of accounting which contains information pertaining to the Collateral that may from time to time be requested by XLF.

**8.9 Inspection of Collateral and Records**. During the Dealer's usual business hours, XLF may inspect and examine the Collateral and check and test the same as to quality, quantity, value, and condition. XLF shall also have the right at any time, during the Dealer's usual business hours or during the usual business hours of any third party having control over the records of the Dealer, to inspect the Dealer's books and records in order to verify the amount, condition of or any other matter relating to the Collateral and the Dealer's financial condition and to copy the Dealer's books and records. The Dealer waives the right to assert a confidential relationship, if any, it may have with any accounting firm in connection with any information requested by XLF and agrees that XLF may directly contact any accounting firm in order to obtain information.

**8.10 Transfer of Collateral**. The Dealer shall not sell, lease, license, transfer or otherwise dispose of any interest in any Collateral except:

    (a) sales of Inventory in the ordinary course of business, and

    (b) licenses and other dispositions of Intellectual Property in the ordinary course of business.

**9. EVENTS OF DEFAULT**

**9.1 Events of Default**. The occurrence of any of the following events shall be considered an Event of Default:

    (a) The Dealer fails to perform any of its Obligations, undertakings, or covenants under this Agreement, including, but not limited to, failing to make an installment of principal or interest under this Agreement when due or upon demand;

    (b) Any warranty or representation made by the Dealer is found to have been false or misleading in any material respect when made, or any schedule, certificate, Financial Statement, report, notice, or other writing furnished by the Dealer to XLF is found to have been false or misleading in any material respect when made or delivered;

    (c) Any damage or destruction of a part of the collateral securing this Agreement occurs and appropriate insurance naming XLF as "Loss Payee" is not in place;

    (d) The Dealer or any Guarantor, or any of their respective parent companies, has defaulted in the payment or performance of any debt or obligation under any other agreement, whether to XLF or to a third party;

    (e) The Dealer or any Guarantor becomes insolvent or generally fails to pay, or admits in writing its inability to pay, its debts as they become due; or the Dealer applies for, consents to, or acquiesces in the appointment of, a trustee, receiver or other custodian for the Dealer or any property of the Dealer, or makes a general assignment for the benefit of creditors; or, in the absence of an application, consent or acquiescence, a trustee, receiver or other custodian is appointed involuntarily for the Dealer or for a substantial part of the property of the Dealer; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceedings is commenced in respect of the Dealer;

    (f) Any material change in management, ownership, or control of the Dealer occurs without the prior written consent of XLF;

    (g) The voluntary or administrative dissolution, death, change of ownership or control of the Dealer;

    (h) Any change in the financial condition of the Dealer or any Guarantor, or any of their respective parent companies, that XLF in good faith deems adverse;

(i) XLF, in good faith, deems itself insecure for any reason; or

(j) The Dealer breaches any term or provision of this Agreement.

**9.2  Delivery of Title**.  The Dealer must deliver or cause to be delivered to XLF the Title or MSO for any Unit of Inventory at the time of any related Floorplan Advance request, or, in the event of an Auction or Third Party Source Purchase, within seven (7) days after XLF funds the related Floorplan Advance.

## 10.  REMEDIES

**10.1  Remedies Generally**.  Upon the occurrence of any Event of Default and at any time after an Event of Default, XLF may, at its option and without notice, exercise any and all of its rights in a separate, successive or concurrent fashion and such exercise of any right shall not preclude pursuit of other rights and remedies at a later time.

**10.2  Acceleration**.  XLF shall have the right to demand immediate payment of the Obligations under the Agreement and this Agreement and all other Indebtedness owed to XLF by the Dealer.

**10.3  Power of Sale**.  XLF shall have all rights and remedies available at law or in equity including, without limitation, the rights and remedies of a secured party under the Indiana Uniform Commercial Code, as in effect from time to time (regardless of whether the Code has been enacted in the jurisdiction where rights or remedies are asserted), including, without limitation, the right to take possession of the Collateral, and for that purpose XLF may, so far as the Dealer can give authority, enter upon any premises on which the Collateral may be situated and remove the Collateral.  XLF shall have the right to notify any account debtors or other Person obligated on Collateral to make payment or otherwise render performance to or for the benefit of XLF.  At XLF's request and to the extent the Dealer may lawfully do so, the Dealer shall assemble, prepare for removal, and make available to XLF at a place designated by XLF which is reasonably convenient to XLF and the Dealer, such items of Collateral as XLF may deem sufficient to cover all of the Dealer's Obligations to XLF.  The Dealer agrees that the Collateral is of the type customarily sold on a recognized market and that XLF has no obligation to notify the Dealer prior to a sale.  The Dealer agrees that ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made is reasonable.  The Dealer agrees that private sale of any item financed by XLF at the amount owed to XLF on that item, less costs reasonably incurred by XLF in preparation of disposition of the Collateral, shall constitute a commercially reasonable method of disposition of that Collateral.  XLF may in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income and hold the same as security for Obligations or apply it on principal or interest due on Obligations.  In the event that XLF takes possession of any Intellectual Property, the goodwill associated with any trademarks, tradenames, trade dress, and service marks of the Dealer shall be transferred to XLF.

**10.4  Advances and Deposits**.  XLF shall have the right to cancel any unfunded Advances.  Any Deposit Accounts, deposits or other sums credited by or due from XLF to the Dealer shall constitute security for the Obligations, and XLF may apply or set-off deposits or other sums against Obligations at any time a Default has occurred and is continuing, and whether or not the Obligations are then due or other Collateral is considered by XLF to be adequate.

**10.5  Receivership**.  XLF shall have the right to initiate proceedings to appoint a receiver in any court of competent jurisdiction.  The Dealer waives the right to notice and hearing of the appointment of a receiver and consents to the appointment without requiring XLF to post a bond.

**10.6  Claims on Bonds**.  To the extent allowed by law, the Dealer gives consent to XLF to proceed in any action to collect on or execute against any bonds that the Dealer has posted with any governmental authorities.

**10.7  Waiver**.  Except as otherwise expressly set forth in this Agreement, to the extent permitted by law, the Dealer waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance and all other demands and notices of any description.  To the extent not prohibited by law, the Dealer waives appraisement, valuation, anti-deficiency, homestead, exemption, or usury laws and releases all right to appeal after payment in full.  With respect to both the Obligations and Collateral, the Dealer assents to any Extension or postponement of the time of payment or any other indulgence, to any substitution, exchange, or release of Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payments and any settlement, compromise or adjustment, all in such manner and at such time or times as XLF may deem advisable.  Except as otherwise provided by law, XLF shall have no duty as to the collection or protection of the Collateral, or any income it generates, nor as to the preservation of rights against prior parties, nor as the preservation of any rights pertaining beyond safe custody.  XLF may exercise its rights with respect to Collateral without resorting or regard to other Collateral or sources of reimbursement for any Obligation.  XLF shall not be deemed to have waived any of these rights upon or under Obligations or Collateral unless the waiver be in writing and signed by XLF.  No delay or omission on the part of XLF in exercising any right shall operate as a waiver of that right or any other right.  A waiver on any occasion shall not be construed as a bar to the exercise of any right on any future occasion.  All rights and remedies of XLF as to the Obligations or Collateral, whether evidenced by the Agreement or by any other instrument or papers, shall be cumulative and may be exercised alone, successively or together.  XLF may, from time to time, without notice to the Dealer:

(a) Retain or obtain a security interest in any property of any other Person, in addition to the Collateral, to secure any of the Obligations;

(b) Retain or obtain the primary or secondary obligation of any party or parties, in addition to the Dealer with respect to any of the Obligations;

(c) Extend or renew for any period (whether or not longer than the original period) or release or compromise any Obligation of any party or parties primarily or secondarily liable to XLF under the Agreement;

(d)  Release its security interest in any of the property securing any of the Obligations and permit any substitution or exchange for any such property; and

(e)  Resort to the Collateral for the payment of any of the Obligations, whether or not it shall have resorted to any other property or shall have proceeded against any party primarily or secondarily liable for any of the Obligations.

XLF shall not have any Obligation for any error or omission or delay of any kind occurring in the liquidation of any Collateral, including the settlement of or the collection of any Account or for any damage resulting from collection or settlement except liabilities resulting from willful misconduct by XLF.

**10.8  Fees, Costs and Expenses**.  The Dealer shall pay to XLF on demand any and all reasonable out-of-pocket expenses, including reasonable attorneys' fees, incurred or paid by XLF in protecting the Collateral, the existence, perfection or priority of XLF's security interest, or the enforcement of the Loan Documents.

**10.9  Proceeds**.  XLF may take control of any funds generated by the Collateral, and in XLF's name or the Dealer's name, demand, collect, receive for, settle, compromise, sue for, repossess, accept returns of, foreclose or realize upon any Collateral.  After deducting all expenses, the residue of any Proceeds of collection or sale of the Collateral shall be applied to the payment of principal or interest on the Obligations in such order of preference as XLF may determine, proper allowance for interest on the Obligations not then due being made, and any excess shall be returned to the Dealer.

**10.10  License**.  The Dealer grants to XLF a license to use, without charge, the Dealer's Intellectual Property and other Collateral in completing production of, advertising for sale, or selling any Collateral after any Default, and all of the Dealer's rights under all licenses and franchise agreements shall, in such event, inure to XLF's benefit.  In addition, the Dealer shall, upon request by XLF, make available such personnel in the Dealer's employ on the date of any Default as XLF may reasonably designate to permit XLF to continue, directly or indirectly, to produce, advertise and sell the Collateral sold by the Dealer under any Intellectual Property or license.  The license shall include the right of XLF to use, assign, license or sublicense any of the Dealer's Intellectual Property, including in the license reasonable access as to all media in which any of the licensed items may be recorded or stored; *provided that,* XLF shall comply with all pre-existing quality control standards and trademark use requirements of the Dealer.  No agreements entered into by the Dealer shall prohibit, restrict or impair the rights of XLF granted hereunder.

**10.11  Reinstatement**.  If, at any time after payment in full by the Dealer of all Obligations and termination of XLF's security interest, any payments on the Obligations previously made by the Dealer or any other Person are disgorged by XLF for any reason whatsoever, including, without limitation, the insolvency, bankruptcy or reorganization of the Dealer or such Person, this Agreement and XLF's security interests shall be reinstated as to all disgorged payments as though such payments had not been made, and the Dealer shall sign and deliver to XLF all Documents, and shall do such other acts and things, as may be necessary to perfect XLF's security interest.

**10.12  No Marshaling**.  The Dealer, on its own behalf and on behalf of its successors and assigns, expressly waives all rights, if any, to require a marshaling of assets by XLF or to require XLF's first resort to some or any portion of the Collateral before foreclosing upon, selling or otherwise realizing on any other portion.

**10.13  Other Rights**.  To the extent XLF has any rights and remedies against the Dealer pursuant to any other agreements between XLF and the Dealer, those rights and remedies shall be in addition to, not in lieu of, the rights and remedies provided for under this Agreement.

**11. MISCELLANEOUS PROVISIONS**

**11.1  Assignment.**  This Agreement may be assigned by XLF but the Dealer may not assign this Agreement without the prior written consent of XLF.  XLF has pledged and assigned its interest in this Demand Note and Security Agreement as collateral for its credit facility to First Tennessee Bank National Association.

**11.2  Amendment, Modification and Merger**.  This Agreement and all documents incorporated by reference are intended by the parties as an amendment and restatement of any prior agreements between XLF and the Dealer.  With the exception of the XLF's right to make amendments and modifications to the terms and conditions set forth above, this Agreement may not be modified or amended except upon the written consent of XLF and the Dealer.  Additionally, the Finance Programs, descriptions of specific Units of Lender-Financed Inventory, amounts and terms of Advances, Maturity Dates, Extensions, Interest, Base Rates, Contract Rates, Risk Fees, Default Rates, Administrative Charges, XLF Program Fees, late fees, NSF fees and other charges allowed by this Agreement or any other Loan Document may be proven by the records kept by XLF.

**11.3  Execution**. The parties understand and agree that XLF may execute this Agreement and all corresponding Documents by affixing an authorized XLF Officer's signature *via* signature stamp or electronic signature.  The Dealer may only execute this Agreement by original signature or through an electronic signature system authorized by XLF.  A facsimile or other electronic reproduction of such authorized XLF Officer's signature and the Dealer's signature on the Agreement and all corresponding Documents shall be deemed original signatures.  The parties acknowledge and agree that this Agreement may be electronically signed.  Each party agrees that the electronic signatures of the parties included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures.

**11.4  Notices**.  All notices, requests and demands to or upon the respective parties, including service of process of any legal proceeding initiated by either party, shall be deemed to have been duly given or made:  if by hand or by facsimile, immediately upon the Business Day of receipt, if received before 5:00 p.m., recipient's time, otherwise on the next Business Day; if by Federal Express, Express Mail or any other overnight delivery service with proof of next day delivery on a Business Day, one (1) Business Day after dispatch; and if mailed by certified mail, return receipt requested, five (5) days after mailing.  All notices, requests and

demands are to be given or made to the Dealer at the address disclosed in the Term Sheet and to XLF at 10333 N. Meridian St., Suite 200, Indianapolis, IN 46290.

**11.5  No Waiver**.  No failure or delay by XLF in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege.

**11.6  Termination**.  No termination of this Agreement shall alter the Dealer's Obligations relating to amounts funded or committed prior to the effective date of such termination, and all rights and remedies, including without limitation, the security interest and the rights of XLF as a secured party, shall extend until all Obligations owed by the Dealer to XLF have been satisfied.

**11.7  Acceptance and Governing Law**.  This Agreement shall not be effective unless and until accepted by execution by an officer of XLF at the address in the State of Indiana set forth in the first sentence of this Agreement.  This Agreement and all rights and obligations, including matters of construction, validity and performance, shall be governed by the Uniform Commercial Code and other applicable laws of the State of Indiana, without regard to conflict of law principles.  However, in the event the Dealer's Location is in the State of California, the validity, enforceability and interpretation of the Note and this Guaranty shall be governed by the laws of the State of California without regard to conflicts of law provisions and each Advance shall be deemed made pursuant to and under the authority of a license issued under the California Finance Dealer Laws.

**11.8  Legal Fees and Collection Costs**.  The Dealer shall pay to XLF all reasonable legal fees, expenses and collection costs incurred as a result of the Dealer's Default or failure to perform any Obligation under this Agreement.

**11.9  Indemnification**.  The Dealer shall indemnify and hold XLF harmless from and against all loss, damage, costs, or expenses of any nature relating to claims of third parties arising from or in any way connected to this Agreement or the Dealer's business affairs including, without limitation, attorneys' fees and expenses incurred both in the defense of any action against XLF and in any action to enforce these indemnity rights as against the Dealer.

**11.10  No Joint Venture or Partnership.**  Nothing contained in this Agreement shall confer upon XLF or the Dealer any interest in, or subject either of them to any obligation for, or in respect of the business, assets, profits, losses or obligations of the other.  This Agreement does not constitute and shall not be characterized as a joint venture or partnership between XLF and the Dealer.  Nothing in this Section 11.10 shall limit or restrict the respective obligations and undertakings of XLF and the Dealer hereunder.

**11.11  Priority**.  Unless otherwise expressly provided, the security interest created by this Agreement shall be *pro rata* on par with any prior security interests in the Collateral now existing in favor of XLF.

**11.12  Set-Off**.  XLF is authorized at any time, without notice to the Dealer, to set-off and apply, directly or through any of XLF's affiliates, any deposits (whether general or special, time or demand, provisional or final) and other assets and properties at any time held in the possession, custody or control of XLF or its affiliates or any indebtedness owed the Dealer by XLF or its affiliates, towards any of the Dealer's Obligations.

**11.13  Statement of Accounts**.  Any statement of the Dealer's account furnished to the Dealer by XLF, to the extent no objection is made in writing by the Dealer within thirty (30) days after receipt of such statement, shall constitute a definitive statement of the Dealer's Obligations as of the date of the statement and shall be binding upon the Dealer.

**11.14  Competency**.  The Dealer and all Guarantors are competent to enter into this Agreement and have the legal authority to enter into and execute this Agreement and all other Loan Documents.

**11.15  Confidentiality**.  The Dealer shall not disclose to any third party, without the prior written consent of XLF, any terms and conditions applicable to this Agreement, regardless of where the terms and conditions appear.

**11.16  Communications**.  The Dealer expressly authorizes and agrees to accept all mailings, facsimile transmissions and telephonic transmissions from XLF including, without limitation, credit information and promotional materials.  The Dealer may establish an account with XLF where information can be accessed and transmissions can be sent through XLF's website.  The Dealer shall have the means to control access to the account information by passwords and a dealer account number in accordance with the policies and procedures set forth by XLF.  To participate, the Dealer shall execute all Documents required by XLF to register for such additional service and shall abide by XLF's policies and procedures.  The Dealer agrees that the online documents shall be incorporated by reference and made a part of this Agreement.

**11.17  Severability**.  Whenever possible each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of that prohibition without invalidating the remainder of the provision or the remaining provisions of this Agreement.  The Dealer recognizes that XLF has relied on this Agreement in extending credit to the Dealer and agrees that such reliance by XLF shall be sufficient consideration for this Agreement.

**11.18  Binding on Successors**.  The rights and privileges of XLF shall inure to the benefit of its respective successors and assigns.

**11.19  Descriptive Heading and Interpretation**.  The descriptive headings are for reference only and shall not control or affect the meaning or construction of any provision of this Agreement.  The terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words.  Words (including the defined terms set forth in Section 12 of this Agreement) of one gender shall be held to include the other gender as the context requires.  Any references to a person or thing in the singular shall also apply to the plural.  Any references in this Agreement or in the other Loan Documents to a particular statute or regulation shall be deemed to include all related amendments, rules and regulations and to any successor statute, rule, or regulation, or published clarifications or interpretations as in effect from time to time.

**11.20  California Dealers**.  In the event the Dealer's Place of Business is in the State of California, the Dealer acknowledges and agrees that any initial Advance made under this Agreement must be in the amount of at least Five Thousand Dollars ($5,000), and the Dealer shall neither request nor accept any initial Advance under this Agreement in an amount less than Five Thousand Dollars ($5,000).

**11.21  Jurisdiction and Venue**.  The Dealer submits to the personal jurisdiction and venue of the state or federal courts of Marion County, Indiana, and agrees that any and all claims or disputes pertaining to this Agreement or to any matters arising out of or related to this Agreement initiated by the Dealer against XLF shall be brought in the state or federal courts located in Marion County, Indiana.  Further, the Dealer expressly consents to jurisdiction and venue of the state or federal courts located in Marion County, Indiana, as to any action brought in such court by XLF and waives any claim of inconvenient forum.  XLF reserves the right to initiate and prosecute any action against the Dealer in any court of competent jurisdiction, and the Dealer consents to the forum as XLF may elect.  However, in the event that this Agreement is made and entered into in the State of California, the state or federal courts located in the State of California shall have jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or related to this Agreement.

**11.22  Waiver of Bond**.  The Dealer waives, to the extent permitted by law, any bond or surety or security on such bond which might, but for this waiver, be required of XLF.

**11.23  Limitation of Liability**.  IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT EVEN IF A LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  IN NO EVENT SHALL XLF BE LIABLE FOR ANY DAMAGES UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (OR IN CONNECTION WITH ANY ADVANCE BY XLF) THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO XLF BY THE DEALER UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

**11.24  Waiver of Jury Trial**.  XLF AND THE DEALER, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY COURSE OF CONDUCT, DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF EITHER OF THEM.  NEITHER XLF NOR THE DEALER SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.  THESE PROVISIONS SHALL NOT BE DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY EITHER XLF OR THE DEALER EXCEPT BY A WRITTEN INSTRUMENT EXECUTED BY BOTH OF THEM.  THIS PROVISION IS A MATERIAL INDUCEMENT TO XLF TO ACCEPT THIS AGREEMENT.

**11.25  JUDICIAL REFERENCE**.  IF DEALER'S LOCATION IS WITHIN THE STATE OF CALIFORNIA, THE FOLLOWING PROVISIONS APPLY:

IN THE EVENT THAT ANY LEGAL PROCEEDING IS FILED IN A COURT OF THE STATE OF CALIFORNIA (THE "COURT") BY OR AGAINST ANY PARTY IN CONNECTION WITH ANY CONTROVERSY, DISPUTE OR CLAIM DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (EACH, A "CLAIM") AND THE WAIVER SET FORTH IN THE PRECEDING SECTION 11.24 IS NOT ENFORCEABLE IN SUCH ACTION OR PROCEEDING, DEALER AND XLF HEREBY AGREE AS FOLLOWS:

(a)   WITH THE EXCEPTION OF THE MATTERS SPECIFIED IN SUBPARAGRAPH B BELOW, ANY CLAIM WILL BE RESOLVED BY A GENERAL REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1.

(b)   THE FOLLOWING MATTERS SHALL NOT BE SUBJECT TO A REFERENCE PROCEEDING: (I) EXERCISE OF SELF-HELP REMEDIES (INCLUDING SET OFF), (II) APPOINTMENT OF A RECEIVER, AND (III) TEMPORARY, PROVISIONAL OR ANCILLARY REMEDIES (INCLUDING WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING ORDERS OR PRELIMINARY INJUNCTIONS).  THIS AGREEMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (I) - (III) AND ANY SUCH EXERCISE OR OPPOSITION DOES NOT WAIVE THE RIGHT OF ANY PARTY TO A REFERENCE PROCEEDING PURSUANT TO THIS AGREEMENT.

(c)   UPON THE WRITTEN REQUEST OF ANY PARTY, THE PARTIES SHALL SELECT A SINGLE REFEREE, WHO SHALL BE A RETIRED JUDGE OR JUSTICE.  IF THE PARTIES DO NOT AGREE UPON A REFEREE WITHIN TEN (10) DAYS OF SUCH WRITTEN REQUEST, THEN ANY PARTY MAY REQUEST THE COURT TO APPOINT A REFEREE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 640(B).  A REQUEST FOR APPOINTMENT OF A REFEREE MAY BE HEARD ON AN EX PARTE OR EXPEDITED BASIS, AND THE PARTIES AGREE THAT IRREPARABLE HARM WOULD RESULT IF EX PARTE RELIEF IS NOT GRANTED.

(d)   ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT WHEN ANY PARTY SO REQUESTS, A COURT REPORTER WILL BE USED AND THE REFEREE WILL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT.  THE PARTY MAKING SUCH REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY COSTS OF THE COURT REPORTER, PROVIDED THAT SUCH COSTS, ALONG WITH THE REFEREE'S FEES, SHALL ULTIMATELY BE BORNE BY THE PARTY WHO DOES NOT PREVAIL, AS DETERMINED BY THE REFEREE.

(e)   THE REFEREE SHALL APPLY THE RULES OF DISCOVERY AND EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA TO THE REFERENCE PROCEEDING AND SHALL DETERMINE ALL ISSUES IN ACCORDANCE WITH APPLICABLE LAW.  THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS

LEGAL RELIEF AND RULE ON ANY MOTION WHICH WOULD BE AUTHORIZED IN A TRIAL, INCLUDING MOTIONS FOR DEFAULT JUDGMENT OR SUMMARY JUDGMENT. THE REFEREE SHALL REPORT THE REFEREE'S DECISION, WHICH REPORT SHALL ALSO INCLUDE FINDINGS OF FACT AND CONCLUSIONS OF LAW.

**12.24 Usury**. Notwithstanding any provisions of this Agreement to the contrary, at no time shall the Dealer be obligated to pay interest at a rate which would subject XLF to either civil or criminal liability due to interest being in excess of the maximum rate XLF is permitted by law to contract or the Dealer is permitted by law to agree to pay. In such circumstances, the rate of interest hereunder shall be deemed to be immediately reduced to such maximum rate, and such interest and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the principal balance of the Obligations as of the date such payment was made. Any such excess shall be held by XLF for the Dealer's benefit without interest and shall be subject to set off by XLF.

## 12. DEFINITIONS

"Account Debtor" shall mean any Person who has Indebtedness to the Dealer.

"Accounts," "Inventory," "Fixtures," "General Intangibles," "Chattel Paper," "Documents," "Goods," "Deposit Accounts," "Instruments," "Inventory," "Investment Property" and "Proceeds" shall mean all of the Dealer's such property within the meanings ascribed in the Uniform Commercial Code as adopted in the State of Indiana.

"ACH" shall mean all payments made by, or on behalf of, the Dealer to XLF *via* a nationwide electronic funds transfer network processing electronic debit entries from the Dealer's bank Accounts pursuant to the ACH Authorization Form executed contemporaneously herewith.

"ACH Authorization Form" shall mean the document signed by the Dealer authorizing payment via ACH.

"Administrative Charge" shall mean any expense charged by XLF to the Dealer that is reasonable or necessary, in XLF's sole discretion, to administer or monitor the Dealer's account, to preserve any Collateral, or to collect any Obligations under this Agreement.

"Advance" shall mean any loan or payment in any amount made pursuant to the Agreement and Term Sheet by XLF to the Dealer or on the Dealer's behalf to any third party.

"Affiliate" means, with respect to any Person, any other Person (a) directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, such Person, or (b) that directly or indirectly owns more than ten percent (10%) of any class of the voting securities or capital stock of or equity interests in such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Demand Promissory Note and Security Agreement, as amended from time to time.

"Auction or Third Party Source Purchase" shall mean any purchase made by or on behalf of the Dealer for which (a) a request for an Advance is made by or on behalf of the Dealer; (b) from an auction or third party business that has entered into a universal funding agreement with XLF; and (c) such request for an Advance is received by XLF within seven (7) days of the Dealer's purchase of the vehicle that is the subject of such request.

"Base Rate" shall mean the rate published in the Dealer Portal. If the Base Rate is not published in the Dealer Portal, then the Base Rate shall be six percent (6%).

"Borrower" shall mean the Dealer and the Guarantors.

"Business Day" shall mean all days on which banks conduct business in Indiana.

"Collateral" shall mean all of the Dealer's property or rights in which a security interest is granted hereunder.

"Contract Rate" shall be the rate disclosed in the Term Sheet effective whenever the Dealer is in compliance with all its covenants, warranties and Obligations under the Agreement, or five percent (5%) if no Term Sheet has been signed or a signed Term Sheet has no disclosed rate.

"Control" shall have the meaning ascribed in the Indiana Uniform Commercial Code, as in effect from time to time.

"Credit Limit" shall mean the maximum amount the Dealer may borrow at any one time under this Agreement.

"Credit Line" shall mean the Dealer's floorplan line of credit pursuant to and under this Agreement.

"Curtailment" shall mean that grant by XLF, in its sole discretion, to the Dealer of additional time extending the Maturity Date. The number of allowable Curtailments shall be as stated on the applicable Term Sheet.

"Curtailment Date" shall mean the day on which the Dealer is required to make the Curtailment Payment to XLF.

"Curtailment Payment" shall mean the sum the Dealer is required to pay XLF to reduce the principal amount due on a unit when the Initial Period and each Extension expires.

"Dealer" shall mean the persons or entities disclosed in this Agreement or the Term Sheet.

"Dealer Portal" shall mean the web-based portal located at https://xlfunding.sharefile.com (or any similar successor portal, interface or website) owned, operated or maintained by XLF and, subject to the Terms and Conditions, to which the Dealer may have access from time to time as determined by XLF.

"Dealership Location" shall mean that place where the Collateral and the Dealer's books and records are kept, where the Dealer's operations are conducted from and/or, if the Dealer is a legally recognized business entity, where the Dealer's registered office is located.

"Dealer's Home Branch" shall mean the XLF branch location for which the Credit Line is assigned to by XLF for servicing and administration.

"Default" means any of the Events of Defaults specified in Section 9 of this Agreement.

"Default Rate" shall mean that rate of interest as stated in the Term Sheet or, in the event that no Term Sheet has been signed or the signed Term Sheet fails to list a Default Rate, then twelve percent (12%).

"Equipment" shall mean all furniture, fixtures, machinery, vehicles, aircraft, watercraft, tools, computers and other Goods other than Inventory held for sale, lease, or daily rental by the Dealer in the ordinary course of business.

"Event of Default" shall have the meaning set forth in Section 9 of this Agreement.

"Extension" shall mean that grant by XLF to the Dealer of additional time that an Advance for an item of Lender-Financed Inventory becomes due and payable.

"Extension Fee" shall mean the fee charged by XLF to the Dealer set forth on the XLF Summary of Rates, Fees and Terms for each individual item of Lender-Financed Inventory.

"Facilities" means the Loan and any other credit facility provided by XLF from time to time pursuant to this Agreement.

"Finance Fee" shall mean the fee charged by XLF to the Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory.

"Finance Program" shall mean any finance program offered by XLF and available to the Dealer for the financing of Inventory pursuant to an Advance under this Agreement.

"Financial Statements" shall mean, as the context may require, the financial statements of the Dealer furnished from time to time pursuant to this Agreement, hereof; in all cases together with any accompanying Agreements or other disclosures to such financial statements, and any other Documents or data furnished to XLF.

"Float Fee" shall mean the fee charged by XLF to the Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory.

"Floorplan Advance" shall mean an Advance made pursuant to this Agreement relating to a Unit of Inventory to be offered for sale by the Dealer in the Ordinary Course of Business.

"Floorplan Application" shall mean the information provided by the Dealer, its principals and the Guarantors to XLF including, but not limited to, the application form provided by XLF.

"Floorplan Fee" shall mean the fee charged by XLF to the Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time as promulgated by the Financial Accounting Standards Board and recognized and interpreted by the American Institute of Certified Public Accountants.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government, including, without limiting the generality of the foregoing, any agency, body, commission, court or department thereof whether federal, state, local or foreign.

"Guarantors" shall mean Persons who have signed guaranty agreements concerning the Obligations of the Dealer pursuant to this Agreement.

"Indebtedness" of a Person means such Person's: (a) obligations for borrowed money; (b) obligations representing the deferred purchase price of Property or services (other than payable arising in the ordinary course of such Person's business payable on terms customary in the trade); (c) obligations, whether or not assumed, secured by any Lien upon or in Property owned by the subject Person or payable out of the Proceeds or production from Property now or hereafter owned or acquired by such Person; (d) obligations which are evidenced by Agreements, acceptances, or other Instruments; (e) capitalized lease obligations; (f) indebtedness or other obligations of any other Person for borrowed money or for the deferred purchase price of property or services, the payment or collection of which the subject Person has guaranteed (except by reason of endorsement for collection in the ordinary course of business) or in respect of which the subject Person is liable, contingently or otherwise, including, without limitation, Obligation by way of agreement to purchase, to provide funds for payment, to supply funds to or otherwise to invest in such other Person, or otherwise to assure a creditor against loss; (g) reimbursement or other obligations in connection with letters of credit; (h) obligations in connection with sale and leaseback transactions; (i) any other transaction which is the functional equivalent of, or takes the place of borrowing, but which would not constitute an Obligation on a balance sheet of such Person prepared in accordance with GAAP.

"Initial Period" shall mean shall mean that number of days set forth in the Term Sheet, beginning on the date of an Advance and ending on the Maturity Date, that an item of Lender-Financed Inventory will be financed by XLF to the Dealer pursuant to the terms of this Agreement. Additionally, in the event no Term Sheet is executed or the Term Sheet fails to list an Initial Period, then the Initial Period shall be thirty (30) days.

"Intellectual Property" shall mean all intellectual property of the Dealer, including, without limitation: (a) all patents, patent applications, patent disclosures and inventions (whether or not patentable and whether or not reduced to practice); (b) all trademarks, service marks, trade dress, trade names, and corporate names and all the goodwill and quality control standards associated therewith; (c) all registered and unregistered statutory and common law copyrights; (d) all registrations, applications and renewals for any of the foregoing; (e) all trade secrets, confidential information, ideas, formulae, compositions, knowhow, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, improvements, proposals, technical and computer data, financial, business and marketing plans, and customer and supplier lists and related information; (f) all other proprietary rights (including, without limitation, all computer software and documentation and all license agreements and sublicense agreements to and from third parties relating to any of the foregoing); (g) all copies and tangible embodiments of the foregoing in whatever form or medium; (h) all damages and payments for past, present and future infringements of the foregoing; (i) all royalties and income due with respect to the foregoing; and (j) the right to sue and recover for past, present and future infringements of the foregoing.

"Interest" shall mean the aggregate rate of interest which accrues on all Obligations owed by the Dealer to XLF under or arising out of the Agreement by combining the Base Rate plus the applicable Contract Rate, Risk Fee or Default Rate.

"Inventory" shall mean all Units held by the Dealer for wholesale or retail sale.

"Lender-Financed Inventory" shall mean any Unit now or after acquired or retained by the Dealer using an Advance under the Agreement and Term Sheet.

"Lender-Financed Inventory Obligation" shall mean obligations related to Units acquired by the Dealer using funds advanced by XLF.

"Letters of Credit" shall mean documents evidencing a third party's obligations to honor drafts or other demands for payment for Obligations of the Dealer.

"Liabilities" shall mean any and all Advances, debts, financial obligations, Administrative Charges, XLF Program Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorneys' fees, costs of collection, covenants, and duties owing, arising, due, or payable from the Dealer to XLF of any kind or nature, present, or future, under any instrument, guaranty, or other document, whether arising under this Agreement, any other Loan Document, or otherwise, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing, or hereafter arising, and however acquired.

"Lien" means any lien, security interest, mortgage, pledge, hypothecation, assignment for the purpose of security, deposit arrangement for the purpose of security, encumbrance or preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, capitalized lease or other title retention agreement).

"Loan Fee" shall mean the fee charged by XLF to the Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory.

"Loans" shall mean loans from XLF to the Dealer in the initial maximum principal amount disclosed in this Agreement and the Term Sheet, or such greater or lesser sum which may be advanced from time to time, governed by this Agreement, including any renewal or Extension thereof.

"Loan Documents" shall mean this Agreement and any UCC Financing Statements and all other Documents executed and delivered by the Dealer incidental to or in connection with the Facilities.

"Material Adverse Effect" shall mean any negative material change in the Dealer's ability to satisfy the Dealer's Obligations.

"Maturity Date" shall mean the date an Advance for an item of Lender-Financed Inventory becomes due and payable; *provided that*, XLF and the Dealer agree that all Advances are due immediately upon demand if XLF elects. In the event the Maturity Date relating to a specific Advance for an item of Lender-Financed Inventory becomes due and payable falls on a federal banking holiday, Saturday or Sunday, the Maturity Date for such specific Advance shall be the next business day subsequent to such federal banking holiday, Saturday or Sunday.

"MSO" shall mean the manufacturer's certificate of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit.

"Obligations" shall mean any and all Advances, indebtedness, Lender-Financed Inventory Obligations, financial obligations, administrative fees, Interest, Floorplan Fees, NSF fees, Float Fees, Loan Fees, Extension Fees, Finance Fees, late fees, charges, expenses, attorney fees, costs of collection, covenants, and duties owing, arising, due or payable from the Dealer to XLF of any kind or nature, present or future, under any instrument, guaranty, or other document whether arising under this Agreement or any other agreement, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising and however acquired.

"Odometer Disclosure Statement" shall mean the sworn statement disclosing whether the mileage reflected on the odometer of the vehicle is accurate.

"Opt-Out Notice" shall mean written notification sent by the Dealer *and* received by XLF no later than thirty (30) days after the Effective Date advising XLF of the Dealer's intent to opt out of the arbitration provisions set forth in this Section 11.23 of this Agreement.

"Permitted Encumbrances" are security interests which have been disclosed to XLF and which XLF has given its advanced written consent.

"Person" means and includes an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated association and a Governmental Authority.

"Property" of a Person means any and all property, whether real, personal, tangible, intangible, or mixed, of the Person, or other assets owned, leased or operated by such Person.

"Purchase Money Inventory" shall mean a Unit acquired by the Dealer pursuant to an Advance under the Agreement and Term Sheet.

"Risk Fee" shall mean the fee set forth on the Term Sheet charged by XLF to the Dealer, in XLF's sole discretion, if the Dealer breaches any representation, warranty, covenant or credit term which does not constitute an Event of Default under this Agreement.

"Schedule of Accounts" shall mean a document identifying each Account together with schedules, certificates and reports relative to all of the Collateral and the amounts received by the Dealer in full or partial payment as Proceeds of the Collateral.

"Shortage" shall mean the difference between a payment received by XLF and the amount owing, arising, due, or payable from the Dealer to XLF with respect to a specific Advance for a specific item of Lender-Financed Inventory.

"Special Terms" shall mean terms disclosed only in the Term Sheet.

"Stock Rights" means any securities, dividends or other distributions and any other right or property which the Dealer shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any securities or other ownership interests in a corporation, partnership, joint venture or limited liability company constituting Collateral and any securities, any right to receive securities and any right to receive earnings, in which the Dealer now has or hereafter acquires any right, issued by an issuer of such securities.

"Subsidiaries" means, as to any Person: (a) a corporation of which shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person, and (b) any partnership, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a fifty percent (50%) equity interest.

"Term Sheet" shall mean the addendum to this Agreement, as modified from time to time, which indicates specific terms and fees, including without limitation, terms regarding the Initial Advance, Special Terms, Floorplan Fees, Float Fees, Loan Fees, Extension Fees, Finance Fees Interest, Initial Period, principal reduction, and Curtailment Date Extensions and which, as modified from time to time, is incorporated herein by this reference.

"Terms and Conditions" shall mean all provisions of this Agreement and the other Loan Documents, with the exception of terms specifically referenced on the applicable Term Sheet and Dealer Portal.

"Title" shall mean the certificate of title or other document evidencing ownership of a Unit issued by a duly authorized state, province or government agency.

"UCC" shall mean the Uniform Commercial Code as enacted in the State of Indiana and in effect as of the date of this Agreement.

"Unit" shall mean any manufactured item, including vehicles for which a certificate of title or a MSO exists.

"Unmatured Default" means any event which with notice, or lapse of time, or both, would constitute a Default.

"Waivers" shall mean, collectively, any and all landlord's waivers, warehouseman's waivers, consignee waivers, creditor's waivers, mortgagee waivers and processing facility and similar bailee's waivers, executed and delivered in connection with this Agreement, in form and substance satisfactory to XLF, together with all amendments, supplements, modifications, substitutions and replacements.

"XLF Program Fee" shall mean any published fee, as stated in the XLF Summary of Rates, Fees and Terms, charged by XLF to the Dealer pursuant to a Finance Program.

"XLF Summary of Rates, Fees and Terms" shall mean that current schedule of applicable universal interest rates, fees and term and condition amendments for each Finance Program, including XLF Program Fees; late fees; fees relating to returned checks or ACH payments due to insufficient funds; the Base Rate; Contract Rate; Risk Fee; Default Rate; and notice of amendments to the Terms and Conditions, published by XLF via posting such schedule of such universal rates and fees and notice of amendments to the Terms and Conditions published by XLF either on the Dealer Portal or at its branch offices or locations.

[SIGNATURE ON FOLLOWING PAGE]



IN WITNESS WHEREOF, the Dealer, on behalf of themselves individually and in their representative capacities, and XLF have caused this Agreement to be executed by their respective officers duly authorized as of 04/09/2021.

**DEALER**

Wedad Cars LLC dba Yosif's Auto Repair

By: _____

Name: Yosif W. Yonis

Title: Manager

Accepted: **XLF**

XL FUNDING, LLC,
an Indiana limited liability company

By: *Cam Hitchcock*

Name: Cam Hitchcock

Title: CEO

XLF Demand Promissory Note and Security Agreement



TERM SHEET

DEMAND PROMISSORY NOTE AND SECURITY AGREEMENT

Dealer: Wedad Cars LLC dba Yosif's Auto Repair (the "Dealer")

Date of Agreement: 04/09/2021

Credit Limit: Two Hundred Fifty Thousand Dollars ($250,000)

The following terms as defined in the Demand Promissory Note and Security Agreement (the "Agreement") shall apply immediately:

Floorplan Fees and
Curtailment Payments:

| | | |
|---|---|---|
| | 90 Day Plan: | Schedule A ☒ |
| | AND | |
| | XLF Float to 45 Day Floor Program: | Schedule B ☒ |

Dealers who participate in the XLerate Float Program may participate in the XLF Float to 45 Day Floor Program.

Interest: Interest shall accrue on all advances under the Agreement at a variable rate, adjusted each business day, based on the Base Rate plus the Contract Rate of two percent (2%) per annum. In event of default, the Default Rate shall be twelve percent (12 %).

IN WITNESS WHEREOF, the Dealer and XLF have caused this Agreement to be executed by their respective officers duly authorized as of the date first above written.

**DEALER**

Wedad Cars LLC dba Yosif's Auto Repair

By: _____

Name: Yosif W. Yonis

Title: Manager

**XLF**

XL FUNDING, LLC,
an Indiana limited liability company

By: *Cam Hitchcock*

Name: Cam Hitchcock

Title: CEO

## Schedule A

### 90 Day Plan

|  | Period | Fee | Cumulative | Curtailment |
|---|---|---|---|---|
| $35 on day 1 | 1-30 days | 35.00 | 35.00 | 0.00% |
| $35 on day 31 | 31-60 days | 35.00 | 70.00 | 0.00% |
| $35 on day 61 | 61-90 days | 35.00 | 105.00 | 10.00% |
| $35 on day 91 | 91-120 days | 35.00 | 140.00 | 0.00% |
| $35 on day 121 | 121-150 days | 35.00 | 175.00 | 0.00% |
| $35 on day 151 | 151-180 days | 35.00 | 210.00 | Payoff |

## Schedule B

### XLF Float to 45-day Floor Program

|  | Period | Fee | Cumulative | Curtailment |
|---|---|---|---|---|
| $30 on day 1 | 1-15 days | 30.00 | 30.00 | 0.00% |
| $30 on day 16 | 16-30 days | 30.00 | 60.00 | 0.00% |
| $30 on day 31 | 31-45 days | 30.00 | 90.00 | Payoff |

Limited to XLERATE Group Auction Float Purchases only.